**JENNIFER L. COON**
California State Bar No. 203913
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: jennifer_coon@fd.org

Attorneys for Mr. Hernandez-Rivera

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE M. JAMES LORENZ)**

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | CASE NO. 08CR0719-L |
| )  Plaintiff, ) | DATE: July 7, 2008 |
| ) | TIME: 2:00 p.m. |
| v. ) | |
| ) | STATEMENT OF FACTS AND |
| RIGOBERTO HERNANDEZ-RIVERA, ) | MEMORANDUM OF POINTS AND |
| ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| Defendant. ) | |

I.

**STATEMENT OF FACTS**[1]

Mr. Hernandez-Rivera is a long-time resident of the United States and a devoted family man. According to information provided by the government, he first entered the United States in 1988. Over the next 20 years, he maintained a steady history of employment in the United States. For the past three years, he has been in a common-law relationship with Esther Garibay, a United States citizen. The couple have two children together, both United States citizens: Abraham Rigo Hernandez, age 2, and Emmanuel Hernandez, who was born just one month ago, in May, 2008, after Mr. Hernandez-Rivera's arrest in this case, and following a difficult and high-risk pregnancy. Ms. Garibay also has a son from a prior relationship, Elijah

---

[1] The following statement of facts, and any further facts or exhibits submitted in support of this motion, are based primarily on information and evidence provided by the government in discovery. Mr. Hernandez-Rivera does not admit the truth or accuracy of such information and evidence, and reserves the right to challenge its truth and accuracy in any subsequent pleadings or during any further proceedings.

Hernandez, age 5, who is also a United States citizen. Mr. Hernandez-Rivera had planned to legally adopt Elijah, who has lived with Mr. Hernandez-Rivera since he was just one year old and who has been raised to believe that Mr. Hernandez-Rivera is his true father. Mr. Hernandez-Rivera is a devoted and beloved husband and father, and supports his family financially by working as a laborer and foreman for a pallet company. Recently, Mr. Hernandez-Rivera and his common-law wife proudly purchased their first home together in Hemet, California. Unfortunately, due to Mr. Hernandez-Rivera's deportation, the couple have been unable to make their mortgage payments, and the home is now at grave risk of foreclosure. The couple had also recently purchased a new Ford F-150 truck together, but because they were unable to make their car payments after Mr. Hernandez-Rivera's deportation, the vehicle was repossessed.

According to information provided by the government, on January 23, 2008, an immigration judge ordered Mr. Hernandez-Rivera removed from the United States. *See* Exhibit A (Order of the Immigration Judge).[2] The proceedings were initiated by a Notice to Appear ("NTA") dated January 14, 2008. *See* Exhibit B (Notice to Appear). In the NTA, the government alleged that Mr. Hernandez-Rivera had entered the United States without inspection in 1988, and suffered a conviction on July 7, 2005, for attempted sodomy with force and attempted kidnapping in violation of Cal. Penal Code §§ 664 and 286(c)(2).[3] *See id.* The government further alleged that Mr. Hernandez-Rivera was removable because he had entered without admission and because he had been convicted of a crime of moral turpitude. *See id.*

At the removal hearing, the immigration judge ("IJ") misinformed Mr. Hernandez-Rivera that he was not eligible for any kind of relief, including voluntary departure. The IJ also failed to inform him that he qualified for a number of other forms of relief, including a Section 212(h) waiver and adjustment of status. Despite Mr. Hernandez-Rivera's statement at the outset of the hearing, that "What happened is that I have my family outside and I cannot be locked up," the IJ failed to inquire about Mr. Hernandez-Rivera's immediate

---

[2] Supporting exhibits and a transcript of relevant portions of the deportation tape will be submitted under separate cover.

[3] Material produced by the government in discovery indicates that Mr. Hernandez-Rivera maintained his innocence of the charges and fought the case through trial. At the time of his sentencing in November 2005, he was released from custody with a time-served sentence of 866 days. He was not deported at that time, and continued to comply with his conditions of probation, until he was arrested by border patrol agents at the probation office in January 2008 and placed in deportation proceedings.

family or the hardship that his deportation would cause. Finally, although the IJ inquired whether Mr. Hernandez-Rivera wanted to appeal, he never explained what an appeal was or ensured that Mr. Hernandez-Rivera understood the meaning of that right. At the conclusion of Mr. Hernandez-Rivera's deportation hearing, the IJ ordered him deported to Mexico. At the time of his deportation, Mr. Hernandez-Rivera had the financial ability and the will to depart the United States on his own.

## II.

## MOTION TO DISMISS THE INDICTMENT

The indictment against Mr. Hernandez-Rivera must be dismissed because the underlying deportation order violated due process. That deportation order was invalid for two separate and independent reasons. First, the IJ misinformed Mr. Hernandez-Rivera that he was ineligible for voluntary departure. Because Mr. Hernandez-Rivera -- who had allegedly entered the United States 20 years previously without admission -- had never been convicted of an aggravated felony after admission, and because he was willing and able to depart the United States on his own, he had plausible grounds for that relief. Second, the IJ failed to inform Mr. Hernandez-Rivera that he was eligible for adjustment of status and a Section 212(h) waiver of inadmissibility. As a longtime resident of the United States, with substantial family ties to the United States and other strong equities, as well as a common-law U.S. citizen spouse who was willing to marry him and petition for a visa on his behalf, Mr. Hernandez-Rivera had plausible grounds for that relief. Because Mr. Hernandez-Rivera's pending charge is based on a removal that was fundamentally unfair, this Court must dismiss the indictment against him.

A.   **Requirements for Collateral Attack of a Removal Order**

"In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation." United States v. Zarate-Martinez, 133 F.3d 1194, 1197 (9th Cir. 1998). A defendant such as Mr. Hernandez-Rivera, who is charged with illegal reentry under section 1326, has a Fifth Amendment right to attack his removal order collaterally because the removal order serves as a predicate element of his conviction. United States v. Mendoza-Lopez, 481 U.S. 828, 837-38 (1987) ("Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful

1  review of the administrative proceeding."). See also United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1047-
2  48 (9th Cir. 2004) (citing Zarate-Martinez and Mendoza-Lopez for these principles).
3        To successfully collaterally attack his deportation, Mr. Hernandez-Rivera must demonstrate that: 1) he
4  exhausted all administrative remedies available to him to appeal his removal order; 2) the underlying removal
5  proceedings at which the order was issued improperly deprived him of the opportunity for judicial review;
6  and, 3) the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d); Ubaldo-Figueroa, 364 F.3d at
7  1048. "An underlying removal order is 'fundamentally unfair' if: '1) a defendant's due process rights were
8  violated by defects in his underlying deportation proceeding, and 2) he suffered prejudice as a result of the
9  defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (citing Zarate-Martinez, 113 F.3d at 1197) (brackets omitted).
10       To establish prejudice, Mr. Hernandez-Rivera does not have to show that he would have been granted
11 relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Id. at 1050
12 (citing Arrieta, 224 F.3d at 1079). Importantly, although Mr. Hernandez-Rivera carries the initial burden on
13 the issue of prejudice, once Mr. Hernandez-Rivera makes a prima facie showing of prejudice, ***the burden***
14 ***shifts to the government to demonstrate that the procedural violation could not have changed the***
15 ***proceedings' outcome***. United States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003) (emphasis
16 added). As explained below, Mr. Hernandez-Rivera can demonstrate each of the elements necessary for this
17 Court to sustain his collateral attack.

18 **B.  The Removal Order Was Fundamentally Unfair Because the IJ Misinformed Mr. Hernandez-**
19     **Rivera of His Eligibility for Relief**
20     **1.  Mr. Hernandez-Rivera Was Eligible for Voluntary Departure**

21       The IJ erred by misinforming Mr. Hernandez-Rivera that he was ineligible for voluntary departure
22 relief. Despite any admonitions to the contrary, Mr. Hernandez-Rivera *was* eligible for relief from removal
23 under 8 U.S.C. § 1229c(a), voluntary departure pre-conclusion of proceeding. It was undisputed that Mr.
24 Hernandez-Rivera entered without inspection, and that he was never lawfully admitted to the United States
25 or granted an adjustment of status to lawful permanent resident. See Exhibit B. As an unlawful entrant who
26 had never been inspected and authorized to enter the United States, Mr. Hernandez-Rivera did not fall under
27 § 1229c(a)'s provision disqualifying "[a]ny alien who is convicted of an aggravated felony at any time after
28 admission." See 8 U.S.C. § 1227(a)(2)(A)(iii) (emphasis added). Mr. Hernandez-Rivera was therefore

eligible for voluntary departure, and the IJ's admonitions to the contrary rendered the proceeding fundamentally unfair.

This Court need look no further than the plain language of 8 U.S.C. § 1229c(a) to determine whether Congress intended an aggravated felon who was not convicted after being lawfully admitted to remain eligible for pre-conclusion voluntary departure—it did. Thus, although there exists a regulation advancing a different standard, 8 C.F.R. § 1240.26, the regulation is invalid and the agency interpretation is entitled to no Chevron deference.

Complicating this relatively straightforward undertaking, however, is 8 U.S.C. § 1229c(e), which purports to convey to the AG unfettered authority to further restrict eligibility for voluntary departure. Admittedly, this legislative delegation, if valid, provides a separate and independent ground that lends 8 C.F.R. § 1240.26 legitimacy. It is not valid, however, because § 1229c(e) is an unconstitutional delegation of legislative power that violates separation of powers. Because the regulation is neither a permissible interpretation of the controlling statute nor an exercise of validly conveyed authority, the plain text of § 1229c(a) controls.

### a. The Plain Language of the Statute Controls

This Court's interpretive task begins with the plain language of the statute. See Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1168 (9th Cir. 2006). No deference is due to "an agency's construction of the statute which it administers . . . [if] Congress has spoken directly to the precise question at issue [and] the intent of Congress is clear." Natural Resources Defense Council v. EPA, 915 F.2d 1314, 1320 (9th Cir. 1990) (quoting Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). When "Congress has spoken directly, in unambiguous terms," the Court need look no further—"that is the end of the matter." Id. Legislative prerogative requires the judicial inquiry to end with clearly stated plain language because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id.

When analyzing the text of § 1229c(a), this Court is "obliged to give effect, if possible, to every word Congress used." Clark, 460 F.3d at 1175. This Court has "consistently rejected interpretations that would render a statutory provision surplusage or a nullity." Id. (quoting In re Cervantes, 219 F.3d 955, 961 (9th Cir. 2000); alterations omitted). Reading the words "at any time after admission" out of the provision incorporated

by § 1229c(a) would violate the rule that the statutory text be construed in "the broader part of the statute as a whole" in order to "avoid a construction which renders any language of the enactment superfluous." See id. at 1175, 1176 (citations omitted). "Only where a sensible result isn't reachable may [this Court] resort to the drastic step of ignoring statutory language." Id. (quoting Hearn v. W. Conference of Teamsters Pension Tr. Fund, 68 F.3d 301, 304 (9th Cir. 1995)(alterations omitted)).

The Ninth Circuit Court of Appeals has embraced Mr. Hernandez-Rivera's reading. See Ortiz-Lopez, 385 F.3d at 1205 n.3 ("Relief from removal under § 1229c(a) is categorically barred to . . . those 'deportable under section 1227(a)(2)(A)(iii),' which in turn means those convicted of an aggravated felony at any time after admission."). Perhaps more compelling, the Attorney General, in promulgating 8 C.F.R. § 1240.26, has also acknowledged that the § 1229c(a) plainly states what Mr. Hernandez-Rivera now argues. See Interim Rules Implementing IIRIRA, 62 Fed. Reg. 10312, 10326, Att'y Gen. Order No. 2017-97 (March 6, 1997) ("Sections 240B(a)(1) and 240B(b)(1)(C) of the statute bar aliens deportable under section 237(a)(2)(A)(iii) of the Act from voluntary departure. Because aliens entering without inspection are no longer considered deportable, however, the statutory bar might be read as allowing such aliens to obtain voluntary departure despite an aggravated felony conviction."). These comments make clear that the AG was aware of the conflict between the regulation he issued and the statutory text; the AG viewed the regulation as correcting a perceived "anomaly" created by the plain language, see id. ("The Department does not believe that Congress intended [the anomaly of more favorable treatment for aggravated felons who enter without inspection]."). The AG believed that issuing the regulation changed the state of the law. Id. ("the Department now exercises its discretion to bar such aliens from receiving this form of relief").

      **b.**    **No Exception to the Plain Language Rule Applies**

The regulation cannot, however, trump the statutory text as a matter of interpretation unless "applying the plain language of the statute would lead to patently absurd results," United States v. Brown, 333 U.S. 18, 27 (1948), or "would render another section within the statute or within the act inoperative or contradictory," Yates v. Hendon, 541 U.S. 1, 17-18 (2004). Because neither exception applies, the "strong presumption that Congress has expressed its intent in the language it chose" is dispositive. See INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987); cf. Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc., 448 F.3d 1092, 1096 (9th Cir. 2006) (Bybee, J., dissenting from denial of rehearing en banc) ("I know

of no 'illogicality' doctrine that permits us [or the AG] to change the words in a statute when we think there is a more logical way that Congress could have written it.").

Section 1229c(a)'s explicit limiting language, which makes pre-conclusion voluntary departure relief unavailable for someone who entered lawfully and then committed an aggravated felony but permits an unlawful entrant convicted of such a crime to apply for such relief makes sense.  Different treatment of lawful and unlawful entrants reflects several perfectly rational policy choices:  (1)  lawful entrants who committed a serious crime after they were granted the privileges and benefits of lawful admission have engaged in an abuse of trust that unlawfully present felons have not;[4] (2) such persons "pose[] a potentially higher risk of recidivism," Taniguchi v. Schultz, 303 F.3d 950, 958 (9th Cir. 2002), and should not get the "second chance" to lawfully reenter that voluntary departure could offer, see Lara-Ruiz v. INS, 241 F.3d 934, 948 (7th Cir. 2001); (3) for unlawfully present criminal aliens, it is a higher priority to ensure their physical departure from the U.S. as expeditiously as possible, with minimal resistance and minimal expenditure of the administrative resources necessary to complete a full-fledged removal hearing;[5] (4) the "benefit" of voluntary departure is virtually illusory for unlawful entrants because they are less likely to have the familial ties to seek lawful reentry, and therefore this form of relief achieves the same result as formal removal while saving the expense of subsidizing the alien's return travel;[6] and (5) Congress need only address a given problem "one step at a time."[7]  Thus, Congress's chosen language is clear.

---

[4]The "abuse of trust" rationale has been embraced by at least seven circuits to explain analogous ineligibility of criminal legal permanent residents (LPRs) versus criminal non-LPRs, who are eligible for INA § 212(h) relief.  See Cordes v. Gonzales, 421 F.3d 889, 897 (9th Cir. 2005); Latu v. Ashcroft, 375 F.3d 1012, 1020-21 (10th Cir. 2004); De Leon Reynoso v. Ashcroft, 293 F.3d 633, 640 (3d Cir. 2002); Jankowski-Burczyk v. INS, 291 F.3d 172, 176 (2d Cir. 2002); (Lukowski v. INS, 279 F.3d 644, 647-48 (8th Cir. 2002); Moore v. Ashcroft, 251 F.3d 919, 925-26 (11th Cir. 2001); Lara-Ruiz v. INS, 241 F.3d 934, 947-48 (7th Cir. 2001).

[5]Section 1229c(a) requires the alien to pay his "own expense[s]" and is only available "in lieu of being subject to proceedings . . . or prior to completion of such proceedings."

[6]Cf. De Leon Reynoso, 293 F.3d at 640 (eligibility for lawful return of unlawful entrants, because they likely lack "the ties to obtain a relative to petition the Attorney General for adjustment of status," is "more theoretical than real . . . and could have led Congress to omit non-LPRs in [§ 1229c's disqualification provision]").

[7]Jankowski, 291 F.3d at 179.  Moreover, "Congress may well have considered that it had already suitably solved the problem presented by [unlawful entrant] aggravated felons" through

Neither is the plain language of § 1229c(a) a "typographical error," which might justify a regulatory correction of Congress's inadvertent mistake. To the contrary, the plain meaning, advocated by Mr. Hernandez-Rivera, is "fully grammatical and can be understood by people of ordinary intelligence." Amalgamated Transit Union, 448 F.3d at 1098 (dissent). Had it so desired, Congress could quite easily have substituted the language it used, "is not deportable under section 1227(a)(2)(A)(iii)," with the regulatory language, "has not been convicted of a crime described in section 101(a)(43) of the Act" or with even simpler language, such as "has not been convicted of an aggravated felony." It did not.[8] The plain language controls.

### c.  Section 1229c(e) Does Not Authorize the Narrowing Regulation

The only remaining source of authority for 8 C.F.R. § 1240.26 is 8 U.S.C. § 1229c(e), which provides: "The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens." 8 U.S.C. § 1229c(e) ("Additional conditions"). To the extent that this grant of authority supports the AG's promulgation of § 1240.26(b)(1)(i)(E) (enlarging § 1229c(a)'s class of ineligible aliens to include all individuals convicted at any time of an aggravated felony), it transgresses the constitutional principles of separation of powers and limit on legislative delegation.

Section 1229c(e) purports to convey to the AG the quintessentially legislative power to repeal duly-enacted legislation, in violation of the Constitution's dedication of such authority to Congress. See U.S. Const. Art. I , § 7 (laws may be made only upon bicameral passage and presentment to the President); Clinton v. New York, 524 U.S. 417, 438 (1998) (absence of a Constitutional provision "that authorizes the President [or the Attorney General] to enact, to amend, or to repeal statutes" is "equivalent to an express prohibition"). Section 1229c(e)'s delegation of power suffers from the same problems as the Line Item Veto Act (LIVA), struck down by the Supreme Court in Clinton. The President's power to unilaterally veto provisions of duly-passed budgetary legislation under LIVA amounted to the power of unilateral repeal—a power the President may not constitutionally posses. Id. at 445-46 ("The fact that Congress intended such a result if of no

---

§ 1228's expedited removal provisions, which foreclose all relief so long as the AG elects to use this mechanism. Jankowski, 291 F.3d at 179.

[8] Congress's word choice was not due to confusion about the difference between deportability and inadmissibility, as the AG suggests, 62 Fed. Reg. at 10326. Congress was well aware of this difference, evident from its ability to distinguish between these concepts in the very same section of IIRIRA. See, e.g., Pub. L. 104-208, § 304 (defining removable as inadmissible under § 212 or deportable under § 237).

moment."). Like LIVA, § 1229c(e) unconstitutionally authorizes an executive branch officer, the AG, to repeal or partially repeal § 1229c(a)'s provision creating the possibility of pre-conclusion voluntary departure. Under its terms, the AG could "limit eligibility for voluntary departure" by making it entirely unavailable—effectively repealing that part of the statute. See id. at 441 ("cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled"). It makes no difference that Section 1240.26 exercises § 1229c(e)'s power to effect a partial (and not a full) repeal of § 1229c(a)—by eliminating voluntary departure for the group of otherwise eligible unlawful entrants to which Mr. Hernandez-Rivera belongs, but not for everyone. See Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 473 (2001) (an agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power"). Neither does the AG's discretion to deny voluntary departure on an individual basis ameliorate the problem because the regulation results in a crucial functional difference: it abrogates the right to individual consideration for relief. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266-68 (1954) (the BIA's "*failure to exercise* its own discretion, contrary to existing valid regulations," due to the AG's blacklisting of petitioner, violated petitioner's due process right to the "opportunity to try . . . to convince the Board" to exercise discretion in his favor); accord Clinton, 524 U.S. at 446-47, 466-67 (Scalia, J., dissenting) (advancing such an argument, rejected by the Court).

Section 1229c(e)'s standardless grant of authority to restrict voluntary departure eligibility also runs afoul of the nondelegation principle because it fails to "lay down . . . an intelligible principle to which the person or body authorized to act is directed to conform." Whitman, 531 U.S. at 472 (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). Indeed, the statute provides "literally no guidance of the exercise of discretion." Id. at 474. Under its terms, the AG may "limit eligibility . . . for *any* class or classes of aliens." 8 U.S.C. § 1229c(e) (emphasis added). This unfettered grant of authority stands in stark contrast to legitimate delegations, where Congress has typically identified a specific purpose,[9] "declared a general rule and imposed the duty of ascertaining what particular cases came within the rule," see Panama

---

[9] See United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725, 416 F.3d 977, 979-80 (9th Cir. 2005) (agency to define what sort of shotgun "is generally recognized as particularly suitable for sporting purposes"); see also South Dakota v. United States Department of the Interior, 423 F.3d 790, 798-99 (8th Cir. 2006) (statute authorizing the Secretary of the Interior to acquire property "for the purpose of providing land for Indians").

Refining Co. v. Ryan, 293 U.S. 388, 426 (1935), or charged the agency with a micro-level administrative task, see Whitman, 531 U.S. at 475 (agency to define which types of grain elevators are "country elevators"). Because "Congress has set up [no] standard for the [AG's] action," has not "required any finding by the [AG] in the exercise of the authority" under the provision, and has made no clear declaration of policy, § 1229c(e)'s broad grant of authority is at the least constitutionally infirm, if not entirely unconstitutional. See Panama Refining Co., 293 U.S. at 415.

Particularly telling is the fact that the AG has employed § 1229c(e)'s power to contravene the express language used by Congress, see 62 Fed. Reg. at 10326, a decision made on the same policy level as the legislative act—which smacks of an "undemocratic" legislative attempt to "escap[e] the sort of accountability that is crucial to the intelligible functioning of a democratic republic."[10] John Hart Ely, Democracy and Distrust 132 (1980) (legislators may delegate power to avoid "politically controversial decisions—to leave them instead to others, most often others who are not elected or effectively controlled by those who are"); see also Cass R. Sunstein, Nondelegation Canons, 77 U. Chi. L.Rev. 315, 317-18 (2000) ("certain highly sensitive decisions should be made by Congress, and not by the executive pursuant to open-ended legislative instructions").

In light of its likely, if not actual, unconstitutionality, constitutional avoidance at the very least requires the scope of § 1229c(e) to be limited to authorize only legitimate administrative purposes. One possible construction would limit "any class or classes of aliens" to classes defined by some nexus to reducing the administrative burden, which is in line with § 1229c(a)'s goal of permitting physical removal without the expending the time and resources necessary to conduct a full hearing. Other provisions of 8 C.F.R. § 1240.26 advance such a goal: subsection (A) requires a request to happen at the earliest merits hearing; (B) permits

---

[10]This risk appears doubly likely in light of § 1229c(e)'s jurisdiction-stripping provision: "No court may review any regulation issued under this subsection." This sentence does not bear upon the appeal at hand, where appellate jurisdiction is undisputed in this direct federal criminal appeal. Moreover, 8 U.S.C. § 1252(a)(2)(D), permitting judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals," appears to permit direct review of the argument raised by Mr. Hernandez-Rivera, notwithstanding "any other provision of this chapter . . . which limits or eliminates judicial review." Finally, precluding consideration of the regulation here would raise serious constitutional problems. Accord United States v. Klein, 80 U.S. (13 Wall.) 128, 146 (1871) (Congress lacks authority to enact statutes purporting to deny jurisdiction, but which effectively "prescribe a rule for the decision of a cause in a particular way").

relief only once; (C) requires the alien not to contest removability; and (D) ensures that no appeal will be taken. Subsection (E), by contrast, would be unauthorized by such a construction because it lacks such a nexus and would actually *increase* the administrative burden by requiring an IJ to conduct a full hearing for individuals like Mr. Hernandez-Rivera and bear the additional burden of potential appeal.

### 2.   Mr. Hernandez-Rivera Was Eligible for Adjustment of Status and a § 212(h) Waiver

As a separate and independent ground for this motion, and irrespective of whether Mr. Hernandez-Rivera was eligible for pre-conclusion voluntary departure, Mr. Hernandez-Rivera's deportation was invalid because the IJ failed to advise him of his eligibility for adjustment of status and waiver of inadmissibility under Section 212(h). Pursuant to Immigration and Nationality Act § 212(h), the Attorney General may grant a waiver of inadmissibility to aliens convicted of certain crimes, if the failure to do so would result in extreme hardship to a U.S. citizen or lawfully resident spouse or child. See 8 U.S.C. § 1182(h)(1)(B). In the cases involving "violent or dangerous crimes," the alien must demonstrate that the denial of relief would result in "exceptional and extremely unusual hardship." 8 C.F.R. § 212.7(d); see also Mejia v. Gonzales, 499 F.3d 991, 997 (9th Cir. 2007) (upholding validity of regulation).

Notably, because Mr. Hernandez-Rivera was never admitted for lawful permanent residency, he could have applied for a § 212(h) waiver whether or not he had a prior conviction for an aggravated felony. See 8 U.S.C. § 1182(h) (barring only permanent residents who have been convicted of aggravated felonies from obtaining a waiver); see also Taniguchi v. Schultz, 303 F.3d 950, 957-58 (9th Cir. 2002) ("[a]lthough it might have been 'wiser, fairer, and more efficacious for Congress to have eliminated § 212(h) relief for non LPR aggravated felons as well,' the decision of Congress [to deny the § 212(h) waiver to aggravated felon LPRs but not to other aliens] was nonetheless a rational 'first step' towards the legitimate goal of rapidly removing criminal aliens").

### 3.   Mr. Hernandez-Rivera Was Prejudiced by the IJ's Failure to Advise Him of His Eligibility for Relief

As noted above, to establish prejudice, Mr. Hernandez-Rivera does not have to show that he would have been granted relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Id. at 1050 (citing Arrieta, 224 F.3d at 1079). Moreover, once Mr. Hernandez-Rivera makes a prima facie showing of prejudice, "the burden shifts to the government to demonstrate that the procedural

1  violation [i.e., failure to advise alien of eligibility for discretionary relief] would not have changed the
2  proceedings' outcome." Gonzalez-Valerio, 342 F.3d at 1054 (emphasis added).

3        Here, Mr. Hernandez-Rivera was prejudiced because he had a plausible claim for pre-conclusion
4  voluntary departure relief.  When IIRIRA took effect in 1997, it made voluntary departure much easier to
5  obtain under certain circumstances—the provisions set forth in § 1229c(a) (relief granted prior to the
6  conclusion of the immigration hearing).  Section 1229c(a), unlike the pre-IIRIRA version of voluntary
7  departure, former 8 U.S.C. § 1254(e), does not require the alien to "establish to the satisfaction of the Attorney
8  General that he is, and has been, a person of good moral character for at least five years." See 8 U.S.C.
9  § 1254(e) (1995).  IIRIRA's enactment of § 1229c(a) in 1996 created a new form of voluntary departure, the
10 primary focus of which was minimizing administrative burdens associated with lawful physical expulsion of
11 illegal aliens—by requiring waiver of the right to a complete hearing, eliminating the availability of judicial
12 review and stays of the time period for departure—rather than rewarding the deserving with a means of
13 avoiding formal deportation.  Compare 8 U.S.C. § 1229c(a) (relief available "in lieu of being subject to
14 proceedings under section 1229a of this title or prior to the completion of such proceedings") with § 1254
15 (1995) (repealed by Pub. L. 104-208 (Sept. 30, 1996)) (requiring a showing of good moral character but not
16 waiver of proceedings).

17       Within the  current immigration scheme, pre-conclusion voluntary departure "reveals Congress'
18 intention to offer an alien a specific benefit—exemption from the ordinary bars on subsequent relief—in
19 return for a quick departure at no cost to the government." Banda-Ortiz v. Gonzales, 445 F.3d 387, 390 (5th
20 Cir. 2006).  In effecting this contract-like exchange, the IJ may exercise discretion to grant voluntary departure
21 even in the face of multiple immigration violations and fraud.  See Matter of Polanco-Davila, 2006 WL
22 901504 (BIA 2006).[11]  Here, Mr. Hernandez-Rivera was willing and able to comply with all of the relevant
23 procedural requirements, including the requirement that he pay his own way.  In sum, the record shows that
24 Mr. Hermandez-Rivera was both eligible for and had a plausible claim for voluntary departure relief.

25       Likewise, Mr. Hernandez-Rivera had plausible grounds for obtaining a § 212(h) waiver and adjustment
26 of status.  At the time of his deportation hearing in January 2008, Mr. Hernandez-Rivera had lived in the

---

[11]Obviously, because 8 C.F.R. § 1240.26 prohibits it (albeit invalidly), there are no cases where discretion has been exercised in favor of individuals convicted of an aggravated felony.  To fault Mr. Hernandez-Rivera for failing to produce such a case would be patently unfair.

1  United States for 20 years.  He had a strong employment history and strong family ties in the United States.
2  He had a U.S. citizen common-law wife, a U.S. citizen son, a U.S. citizen stepson whom he had raised as his
3  own, and a third U.S. citizen child on the way.  The family had recently purchased their first home, which was
4  at risk of foreclosure due to Mr. Hernandez-Rivera's deportation.  The family had also recently purchased a
5  new truck, which was repossessed as a result of his deportation.  His common-law wife was in the midst of
6  a difficult and high-risk pregnancy, and was unable to care for or financially support the family on her own.
7  She desperately needed Mr. Hernandez-Rivera's emotional, physical, and financial assistance, and she and
8  their children faced exceptional and extremely unusual hardship as a result of his deportation.  As a result,
9  Mr. Hernandez-Rivera was both eligible for and had a plausible claim for § 212(h) relief.
10         Mr. Hernandez-Rivera was also eligible to adjust status through his common-law wife.  At the time
11 of his removal proceeding in January 2008, Mr. Hernandez-Rivera was in a committed, long-term relationship
12 with his common-law wife, Esther Garibay, a U.S. citizen.  Ms. Garibay would have legally married Mr.
13 Hernandez-Rivera and petitioned for him to receive an immediate visa as the spouse of a U.S. citizen.
14 Importantly, Mr. Hernandez-Rivera need not show that he had relief immediately available to him at the time
15 of his removal proceeding.  Rather, he must show only that it is "plausible" that relief would have become
16 available during the pendency of the proceedings.  See United States v. Jimenez-Marmolejo, 104 F.3d 1083
17 (9th Cir. 1996) (finding prejudice and reversing § 1326 conviction, where defendant would have accumulated
18 sufficient physical presence in the United States had he appealed his order of deportation); Drax v. Reno, 338
19 F.3d 98, 111 (2nd Cir. 2003) ("Although Drax was not eligible for an adjustment of status at the time of his
20 immigration hearing, the Immigration Judge erred in holding that Drax could under no circumstances become
21 eligible for such relief, because such relief ... was a reasonable possibility if the Immigration Judge had been
22 willing to grant Drax a continuance"); United States v. Flores-Rodriguez, 236 Fed. Appx. 338 (9th Cir. 2007)
23 (unpublished) (remanding because it was "plausible [defendant] would have been able to obtain a visa [based
24 on relationship to LPR mother] while his appeal was pending or before the expiration of any continuance the
25 IJ might have granted had he requested it").
26         In sum, the record shows that Mr. Hernandez-Rivera was both eligible for and had a plausible claim
27 for § 212(h) relief and adjustment of status, as well as voluntary departure.  However, to the extent that this
28 Court does not believe that Mr. Hernandez-Rivera has shown sufficient equities, he requests an evidentiary

hearing, during which he can present evidence to show the plausibility that he would have received relief from deportation.

### C.     Mr. Hernandez-Rivera Is Exempt from the Exhaustion Requirement

Mr. Hernandez-Rivera's appellate waiver was invalid, because: 1) the IJ's advisals regarding his appellate rights were inadequate; and 2) the IJ failed to inform Mr. Hernandez-Rivera of potential relief from deportation for which he was eligible.  Accordingly, Mr. Hernandez-Rivera is exempt from the exhaustion requirement.

Had Mr. Hernandez-Rivera "'validly waived the right to appeal [his removal order] during the deportation proceedings,'" he would be barred under 8 U.S.C. § 1326(d) from collaterally attacking his underlying removal order as a defense to the section 1326 charge.  Ubaldo-Figueroa, 364 F.3d at 1048 (quoting United States v. Muro-Inclan, 249 F.3d 1180, 1182 (9th Cir. 2001)).  However, the exhaustion requirement cannot bar collateral review when—as in this case—the waiver of the right to administrative appeal did not comport with due process.  See id.

A waiver of the right to appeal a removal order does not comport with due process when it is not "considered and intelligent."  Id.  See also United States v. Pallares-Galan, 359 F.3d 1088, 1096 (9th Cir. 2004); United States v. Leon-Paz, 340 F.3d 1003, 1005 (9th Cir. 2003).  As the Ninth Circuit held in Pallares-Galan:

> For a waiver to be valid, the government must establish by "clear and convincing evidence," Gete v. INS, 121 F.3d 1285, 1293 (9th Cir. 1997), *that the waiver is "considered and intelligent."* United States v. Lopez-Vasquez, 1 F.3d 751, 753-54 (9th Cir. 1993)(en banc); see also United States v. Gonzalez-Mendoza, 985 F.2d 1014, 1017 (9th Cir. 1993) (finding a due process violation where immigration judge failed to inquire whether right to appeal was knowingly and voluntarily waived).

Pallares-Galan, 359 F.3d at 1097 (emphasis added.).  In this case, the government cannot establish by clear and convincing evidence that Mr. Hernandez-Rivera's appellate waiver was "considered and intelligent," because Mr. Hernandez-Rivera's waiver was based on inadequate and inaccurate advisals regarding his rights.

####      1.     Mr. Hernandez-Rivera Was Inadequately Advised Regarding the Appellate Waiver

The short colloquy between the IJ and Mr. Hernandez-Rivera demonstrates that any purported waiver was not considered and intelligent.  See, e.g., Pallares-Galan, 359 F.3d. at 1093, 1098 (no express or implied waiver where IJ asked alien if he wished to appeal and alien stated that "[i]t would be better if I leave my

children, that's fine" (emphasis removed)); <u>United States v. Arrieta</u>, 224 F.3d 1076, 1079 (9th Cir.2000) (finding due process violation in a section 1326 collateral appeal because IJ failed to tell the defendant about his eligibility for waiver of deportation); <u>United States v. Arce-Mendez</u>, 163 F.3d 559, 563 (9th Cir. 1998) (same); <u>Zarate-Martinez</u>, 133 F.3d at 1198 (holding that IJ's conversation with petitioner where IJ asked, "do you understand your rights?" and petitioner responded "yes," did not "qualify as an express or implied 'voluntary or intelligent' waiver of the right to appeal, even though IJ had previously informed the group that they would have the right to appeal); <u>United States v. Lopez-Vasquez</u>, 1 F.3d 751, 753 (9th Cir. 1993) (en banc) (alien's waiver was not "considered and intelligent" even though the IJ thoroughly explained the right to appeal at a group hearing because the IJ failed to solicit separate responses from each individual; fact that the petitioner knew what an appeal was "was insufficient"; the IJ's actions may have conveyed the message that the petitioners would not benefit from an appeal).

Here, the IJ never offered any explanation of what an appeal was, nor did he inquire whether Mr. Hernandez-Rivera knew and understood what an appeal was. Like the appellate advisals held inadequate in the cases cited above, the IJ's appellate advisal in this case was invalid. Because Mr. Hernandez-Rivera's waiver of appeal was invalid, he may attack the validity of his prior deportation without having exhausted his administrative remedies.

 **2.    The IJ Failed to Advise Mr. Hernandez-Rivera of His Eligibility for Relief From Deportation.**

Mr. Hernandez-Rivera is also exempt from the exhaustion requirement because the IJ did not inform him that he was eligible for relief from deportation, including voluntary departure and adjustment of status/§ 212(h) waiver of inadmissibility, despite the fact that Mr. Hernandez-Rivera was eligible for such relief. The IJ did not have any dialogue with Mr. Hernandez-Rivera at all about any potential grounds of relief that Mr. Hernandez-Rivera may have been eligible for, other than to tell him that he was ineligible for voluntary departure or any other form of relief. The IJ then ordered Mr. Hernandez-Rivera deported. The IJ then asked Mr. Hernandez-Rivera whether he wanted to appeal, to which Mr. Hernandez-Rivera responded "no." Of course, the IJ's lack of advisal as to any relief that may have been available to Mr. Hernandez-Rivera would have suggested to Mr. Hernandez-Rivera that he would not receive any benefit from an appeal, making any subsequent appellate waiver invalid.

An IJ's failure to advise the alien of his eligibility for relief from deportation makes a deportation proceeding defective. Ubaldo-Figueroa, 364 F.3d at 1048. See also Arce-Mendez, 163 F.3d at 563 ("[W]here the record contains an inference that the petitioner is eligible for relief from deportation, the IJ must advise the alien of this possibility and give him the opportunity to develop the issue."); Lopez-Vasquez, 1 F.3d at 754 (holding that IJ hearing deprived petitioner's right to due process even where the IJ explained the right to appeal and provided petitioner with a form explaining his right to an appeal in Spanish because the information was given to him in a group format); Mendoza-Lopez, 471 U.S. at 840 (failure of IJ to advise alien of his right to appeal and his eligibility for a waiver of deportation violated his due process rights and "amounted to a complete deprivation of judicial review of the determination); Arrieta, 224 F.3d at 1079 (finding due process violation because IJ failed to tell defendant about his eligibility for a waiver of deportation); Moran-Enriquez v. INS, 884 F.2d 420, 423 (9th Cir. 1989) (where record, fairly reviewed by a person intimately familiar with the immigration laws (the IJ) raises a reasonable possibility that the petitioner may be eligible for relief, the IJ must advise the alien of this possibility, if the petitioner is not advised of this possibility, the appellate waiver is invalid) (citing 8 C.F.R. § 242.17(a)).

In particular, when a respondent appears pro se, the IJ must conduct a sufficient inquiry into the respondent's personal circumstances to develop the record and inform the alien of any potential relief. See 8 C.F.R. § 1240.11(a)(2) (2006) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing"); Agyeman v. INS, 296 F.3d 871, 884 (9th Cir. 2002) (stating that "the IJ has a duty to fully develop the record when an alien proceeds pro se"). The IJ therefore "must scrupulously and conscientiously probe into, enquire of, and explore for all relevant facts." United States v. Jacinto, 208 F.3d 725, 733 (9th Cir. 2002 (internal citations omitted); see also Colmenar v. INS, 210 F.3d 967 (9th Cir. 2000) (right to a "full and fair" hearing violated when IJ failed to elicit relevant testimony from alien); United States v. Arce-Hernandez, 163 F.3d 559, 563 (9th Cir. 1998) ("where the record contains an inference that the petitioner is eligible for relief from deportation, the IJ must advise the alien of this possibility and give him the opportunity to develop the issue").

The Immigration Judge Benchbook implements these regulatory and constitutional requirements by requiring the IJ to treat pro se respondents differently. See U.S. Dep't of Justice, Exec. Office of Imm. Rev., Immigration Judge Benchbook at 110 (2001) ("Benchbook"). In particular, "[t]he Immigration Judge has a

responsibility to advise the respondent of any relief to which he may be entitled to apply." Id. Moreover, "[i]n all pro se matters, the [IJ] must be careful and solicitous of the respondent [so as to be] certain to have advised the respondent of all of his rights and obligations and the consequences of his obligations." When addressing pro se respondents, the IJ must ensure that "all of the respondent's questions will be answered." Id. at 110. As a result of this "solicitous" inquiry, the Benchbook notes, "in the case of an unrepresented respondent, the Immigration Judge will have to take a more active role in the development of the hearing." Id. at 110.

The IJ in this case failed to engage in even the most cursory inquiry of Mr. Hernandez-Rivera's circumstances, and consequently failed to advise him of relief for which he was plainly eligible. The IJ also failed to follow up on what little information Mr. Hernandez-Rivera was permitted to offer. In particular, although Mr. Hernandez-Rivera stated that "I have my family outside and I cannot be locked up," the IJ never inquired about his immediate family, or the hardship that his family would suffer should Mr. Hernandez-Rivera be deported. The minimal inquiry of pro se respondents that due process requires would have revealed Mr. Hernandez-Rivera's eligibility for relief. Mr. Hernandez-Rivera's failure to appeal the IJ's order of deportation and exhaust his administrative remedies cannot bar collateral review of his deportation proceeding where the defects in the proceeding served to persuade Mr. Hernandez-Rivera that any appeal would be futile.

D.     **Mr. Hernandez-Rivera Was Deprived of Judicial Review**

To sustain a collateral attack on his removal order, Mr. Hernandez-Rivera must also demonstrate that the deportation proceedings improperly deprived him of judicial review. 8 U.S.C. § 1326(d)(2). As explained above, Mr. Hernandez-Rivera was deprived of the opportunity for judicial review, because he did not make a considered and intelligent waiver of his right to appeal. He did not make a considered and intelligent waiver of his right to appeal because the IJ did not explain the right to him adequately, abdicated his responsibility to develop the record, and improperly advised him that he was ineligible for relief from deportation. In Ubaldo-Figueroa, the Ninth Circuit found the "deprivation of judicial review" requirement met when an IJ failed to inform a petitioner of his right to appeal the deportation order. Ubaldo-Figueroa, 364 F.3d at 1050. Likewise, Mr. Hernandez-Rivera was deprived of judicial review because of the IJ's inadequate advisals regarding appellate waiver and the IJ's failure to inform him of his eligibility for relief from deportation.

### III.

### MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel is still in the process of obtaining evidence in support of these motions. In addition, discovery is continuing. Therefore, counsel requests the opportunity to supplement this motion with further evidence and briefing at or prior to the hearing on this matter, and to file additional motions as necessary.

### IV.

### CONCLUSION

For the foregoing reasons, Mr. Hernandez-Rivera respectfully requests that the Court grant the above motions.

Respectfully submitted,

DATED:    June 23, 2008

/s/ *Jennifer L. Coon*
**JENNIFER L. COON**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Hernandez-Rivera

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

    Courtesy Copy Court

    Assistant United States Attorney via ECF

Dated: June 23, 2008

    /s/   Jennifer L. Coon
JENNIFER L. COON
Federal Defenders of San Diego, Inc
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467 (tel)
(619) 687-2666 (fax)
e-mail: Jennifer_Coon@fd.org